IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| BETTY CREASY, | ) | |
|---|---|---|
| | ) | CIVIL ACTION NO. 12-00953 |
| Plaintiff, | ) | Magistrate Judge Cynthia Reed Eddy |
| | ) | |
| v. | ) | |
| | ) | |
| SLIPPERY ROCK AREA SCHOOL | ) | |
| DISTRICT; KRISTIE SHULSKY, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Before the Court is a three count Amended Complaint [ECF No. 16] filed by Betty Creasy ("Creasy" or "Plaintiff"), a former guidance counselor employed by Defendant Slippery Rock Area School District ("the District"). Also named as a Defendant is Kristie Shulsky ("Shulsky"), who was at all relevant times, the Slippery Rock High School principal.[1] In her Amended Complaint, Creasy alleges age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, et seq. ("ADEA") (Count I); Age Discrimination in Employment under the Pennsylvania Human Relations Act, 43 Pa. Con. Stat. Ann. §§ 955, et seq. ("PHRA") (Count II), and retaliation in violation of Plaintiff's First Amendment pursuant to 42 U.S.C. § 1983 (Count III). Pending is Defendants' Partial Motion to Dismiss, filed as to Count III. [ECF No. 17]. The Court finds that Plaintiff has failed to state a First Amendment claim against either Defendant; therefore, the Motion will be granted.

I. BACKGROUND

Plaintiff was employed by the District for a total of eleven years. Beginning with the academic year 2007-2008, Creasy served as a guidance counselor at the District's high school.

---

[1] The parties have consented to jurisdiction by the United States Magistrate Judge. See [ECF Nos. 6 and 7]. See also 28 U.S.C. § 636(c)(1).

[ECF No. 16 at ¶ 5]. Apparently, she had no issues with the District or the high school administration until Shulsky became principal at the end of the academic year 2008-2009. [Id. at ¶6]. Approximately one year later, Shulsky began design of a comprehensive change in the overall school schedule designated to take effect in the fall of 2010. This revision contemplated modification of the existing eight period schedule and course offerings. [Id. at ¶3]. The planned schedule change "required significant additional work to implement" and "Creasy agreed to work an additional two weeks" in the summer of 2010 to finalize the changes. [Id. at ¶ 17]. When the new schedule was disseminated two weeks prior to the start of the school year, it proved controversial, generating "numerous complaints from parents" who directed their concerns to the District Superintendent. "[T]he . . . schedule . . . was [in]consistent with the students' expectations and assumptions from the prior semester when they had selected courses. Accordingly, many students [had chosen] electives that no longer fit into their schedules." [Id. at ¶21]. These scheduling conflicts were particularly problematic for gifted students who sought advanced placement courses and students in vocational courses. [Id. at ¶22]. The scheduling upset led to a groundswell of parental questions and comments." [Id. at ¶ 26]. Numerous parents called the District Superintendent, who referred the parents to Creasy because Shulsky was on vacation. [Id. at ¶18]. Although Creasy was not the only contact, on a single day, she found over 110 messages on her phone. [Id. at ¶27]. "Creasy pointed out some inherent problems with the Master schedule . . . to [the Superintendent], who contacted . . . Shulsky about it." [Id. at ¶18]. After her meeting with the Superintendent, Shulsky "complained that she [had] 'her ass handed to her on a plate.'" [Id. at ¶28].

"On August 28, 2010, Shulsky sent a harsh letter to the guidance counselors informing them they were responsible for all parent complaints and would face a reprimand if they failed to

address [them]." [Id. at ¶30]. After receiving this letter, Creasy contacted her union representative to express concern about the schedule and her worry that Shulsky's "effort to shift responsibility for the problems could negatively impact her relationship with the parents and . . . the school faculty and staff." [Id. at ¶32].

Despite the fact that Creasy agreed to work with Shulsky to finalize the schedule over the Labor Day weekend, certain thorny issues could not be resolved. [Id. at ¶34]. Tensions mounted, and "Shulsky became increasingly frustrated and hostile towards . . . Creasy." [Id. at ¶35]. For example, Shulsky reclaimed a door key that Creasy had possessed for four years, gave her multiple tasks to be performed in a short amount of time, sent her secretary to Creasy's office to read memos "out loud in the office area, with vocal inflections to mimic the directive as she was told," and "began advancing the idea that the scheduling issues were due to clerical errors and mistakes by . . . Creasy." [Id. at ¶¶ 36- 39] Shulsky also adopted a policy that all communication between Shulsky and Creasy be in writing. [Id. at ¶42].

In response to Shulsky's actions, Creasy met with many parents, advising them that they should not complain to her, but should raise scheduling issues "by working up the chain of authority." [Id. at ¶45]. She did so in the hope that the District would respond, and undo the harm that had been caused to the students' educational goals. [Id. at ¶46].

On September 7, 2010, Creasy received an email from Shulsky complaining that Creasy had told teachers that Shulsky had "messed up the schedule." [Id. at ¶ 47]. Shulsky wrote: "Trust and loyalty are huge with me. You have broken that trust because every time I turn around I have a parent or teacher telling me that you said something or comments that are untrue." [Id.]. Creasy forwarded this email to her union representative to advise him of the scheduling problems and Shulsky's effort to place these problems at Creasy's feet. Shulsky was monitoring Creasy's

3

email and "became incensed that . . . Creasy was seeking Union protection." [Id. at ¶49]. In an email, Shulsky warned Creasy not to involve the union. "Her warning was meant to, and did, in fact chill Mrs. Creasy's expressive and associative activities." [Id.].

In an attempt to alleviate the growing hostility, the union president scheduled a September 17, 2010 meeting with the Superintendent. [Id. at ¶50]. Before that meeting could take place, Shulsky sent Creasy a memorandum directing her to appear in Shulsky's office with a union representative. [Id. at ¶51]. On September 16, 2010, that meeting took place with Shulsky, Creasy, a union representative, and the assistant principal attending. [Id. at ¶52]. Creasy characterizes Shulsky's conduct at that meeting as "blatantly hostile and intimidating." (Id.). Shulsky criticized Creasy's character and job performance, and "also physically intimidated . . . Creasy by leaning across the table [and] shouting." [Id.]. Shulsky also presented Creasy with a "Letter of Reprimand," identifying multiple deficiencies in Creasy's job performance and notifying her that if she failed to remedy these shortcomings, she would receive a second reprimand. [Id. at ¶53]. "Two letters can serve as grounds for initiating a teacher's discharge." [Id. at ¶54]. The union responded to the escalating situation by filing a grievance. [Id.]

Due to the almost daily threats of an additional reprimand, Creasy experienced stress and, after consulting a physician, was placed on extended sick leave. [Id. at ¶60]. While Creasy was on leave, Shulsky continued to make life difficult for her. Creasy's access to her email account was blocked. "Not only did [this interfere with . . . Creasy's ability to assist her substitute and respond to co-workers, but . . . with her union position as the coordinator of the sick-leave bank." [Id. at ¶¶ 61- 62].

A hearing on the grievance was held on October 18, 2010. Creasy, Shulsky, two union representatives, the assistant principal, and the Superintendent attended. As a result of the

4

meeting, Shulsky's Letter of Reprimand was revised, but Creasy contends that it remained punitive in tone. [Id. at ¶63]. Creasy's request to be transferred to another school was denied. [Id. at ¶64]. After the meeting, it became clear to Creasy that because she was being asked to return to a "work environment where she would be forced to endure daily threats of reprimand and other belittling behavior [that] was completely incompatible with her mental well-being," she had no choice but to resign. [Id. at ¶66].

In Count III of her Complaint, Creasy states that when she "met with School District Officials, corresponded with union officials, and attempted to notify parents of their right [sic]," she engaged in activity protected by the Petitions, Association, and Free Speech clauses of the First Amendment. [Id. at ¶¶103, 107]. Creasy's activities resulted in Shulsky, as a policy and final decision maker for the District, retaliating against her by creating a hostile working environment so as to force Creasy's resignation. [Id. at ¶105].

## II. STANDARD OF REVIEW

In deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations and construe them in the light most favorable to the non-moving party. Phillips v. Cty of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). In Phillips, the United States Court of Appeals for the Third Circuit reiterated the pleading requirements under Rule 12(b)(6) explained by the Supreme Court in Twombly v. Bell Atl. Corp., 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 550 U.S. 662 (2009). See Phillips, 515 F.3d at 233–34. These motions are to be evaluated under a three-pronged approach. First, the Court must identify the elements essential to the plaintiff's cause of action. Second, the court evaluates whether the complaint sets forth factual allegations as opposed to conclusory statements; the former it accepts as true, and the latter it disregards. See Fowler v. UPMC Shadyside, 578 F.3d 203, 210–

11 (3d Cir. 2009). Third, if the complaint sets forth factual allegations, the Court must determine whether they support a claim to relief that is plausible on its face. See Iqbal, 556 U.S. 662, 677-78. The plausibility requirement is met when the plaintiff pleads facts that allow the court reasonably to infer that the defendant is liable for the misconduct alleged. Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009). This standard does not impose a probability requirement at the pleading stage, but instead requires that the facts alleged be sufficient to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of the claims made. See Iqbal, 556 U.S. at 678; Phillips, 515 F.3d at 234.

III. DISCUSSION

In order to establish a claim under 42 U.S.C. § 1983, a plaintiff must show that a person acting under color of state law deprived him of a right secured by the Constitution or the laws of the United States. Nicini v. Morra, 212 F.3d 798, 805 (3d Cir. 2000).[2] It is undisputed that, at the time of the events alleged, Shulsky was acting under color of state law. Consequently, the Court's focus is on whether Creasy has alleged facts sufficient to support a First Amendment retaliation claim. In order to survive a motion to dismiss on this claim, Plaintiff must have alleged facts sufficient to establish the plausibility of three elements: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from

---

[2] The Amended Complaint does not allege facts supporting a plausible claim of District involvement in the deprivation of Creasy's First Amendment rights. The District is a municipal entity, and cannot be liable under section 1983 unless the government body itself "'subjects' a person to a deprivation of constitutional rights, or 'causes' a person 'to be subjected' to such deprivation. Connick v. Thompson, ___U.S.___, ___, 131 S.Ct. 1350, 1359 (2011) (quoting 42 U.S.C. § 1983)). A municipality cannot be held liable for the unconstitutional actions of its employees under the doctrine of respondeat superior. Monell v. Dept. of Social Servs., 436 U.S. 658, 691 (1978). Plaintiff has alleged nothing to suggest that an official municipal policy caused her injury. "To satisfy the pleading standard, [a plaintiff] must identify a custom or policy, and specify exactly what that custom or policy was." McTernan v. City of New York, 564 F.3d 636, 658 (3d Cir. 2009). Because Plaintiff has failed to meet the Monell standard with respect to the District, all First Amendment claims against the District will be dismissed with prejudice.

exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." Thomas v. Indep. Twp., 463 F.3d 285, 296 (3d Cir. 2006). The Court considers the elements of Plaintiff's First Amendment claim seriatim.

Interference with Creasy's Freedom of Speech

"When the plaintiff is a public employee, [her] speech is protected by the First Amendment only if [she speaks] as a citizen on matters of public concern and not pursuant to [her] official duties." Thomas v. Pocono Mountain Sch. Dist., No. 3:10- CV- 1946, 2012 WL 3542413 at *9 (3d Cir. Aug. 14, 2012) (citing Garcetti v. Ceballos, 547 U.S. 410, 417 (2006)). Creasy contends that she spoke as a citizen when she met with "School District officials, corresponded with union officials, and attempted to notify parents of their right[s]" because the complaints she voiced "centered on her concerns regarding the quality of education and the plans of students which were disrupted by the new Master Schedule developed by . . . Shulksy." [Id. at ¶108]. Under controlling case law, Creasy's speech does not fall within the parameters of the First Amendment.

The First Amendment protects public employees from retaliation for engaging in constitutionally protected speech. Farneski v. Cty of Hunterdon, ___ F. Supp. 2d ___, Civil Action No. 4769, 2013 WL 86001 at *6 (D.N.J. Jan. 09, 2013) (footnote and citation omitted). "Whether particular speech is protected is a matter of law." Miller v. Clinton Cty, 544 F.3d 542, 548 (3d Cir. 2008). A retaliation claim will not survive a Motion to Dismiss unless the employee is able to provide facts supporting a plausible inference she that she spoke as a citizen, and that the substance of her speech addressed a matter of public concern. See Sousa v. Roque, 578 F.3d 164, 170 (2d Cir. 2009); Castro v. Cty of Nassau, 739 F. Supp.2d 153, 179 (E.D.N.Y. 2010). If either of these requirements is not adequately supported, Creasy's First Amendment retaliation

7

claim fails. See Roque, 578 F.3d at 170. In order to demonstrate that she spoke as a citizen, Creasy must first allege facts sufficient to show that her speech involved more than a topic of purely personal interest, and that it was not undertaken in her official capacity. See Connick v. Myers, 461 U.S.138 (1983); Garcetti, 547 U.S. at 410. "The standard for guiding this inquiry is whether the speech in question was made pursuant to the practically understood or expected duties of a Plaintiff's employment." Moore v. Darlington Twp., 690 F. Supp. 2d 378, 389 (W.D. Pa. 2010). Speech made in the context of a person's job duties is "speech that owes its existence to a public employee's professional responsibilities." Garcetti, 547 U.S. at 421.

The Supreme Court has provided a framework for determining whether an individual's speech took place pursuant to her official duties, stating that the "'proper inquiry'" into what are an individual's official duties "'is a practical one.'" Gorum v. Sessoms, 561 F.3d 179, 185 (3d Cir. 2009) (quoting Garcetti, 547 U.S. at 424). "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform . . . ." Id. The Court of Appeals for the Third Circuit has held as well that a claimant's speech might be considered part of his official duties if it relates to 'special knowledge' or 'experience' acquired through his job." Id. (citing Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir. 2007), overruled on other grounds by Borough of Duryea v. Guarnieri, 131 S.Ct. 2488, 2491 (2011). "In Garcetti, the Supreme Court clarified that, even if an employee's speech touches on a matter of public concern, it is not protected speech 'as a citizen' if it was made pursuant to the employee's official duties." Cindrich v. Fisher, Nos. 06-2615, 07-2969, 2009 WL 1950073 at *3 (3d Cir. July 8, 2009)(citing Garcetti, 547 U.S. at 421).

When Creasy's speech is analyzed against the background of the law, it is clear that it fell within the scope of her official duties. This speech includes Creasy's speaking to parents,

8

faculty, and district officials about Shulsky's alleged mismanagement of the high school administration, complaints to her union about the revised schedule, about who would be blamed for problems associated with the change, and whose place it was to handle parent inquiries and complaints. [ECF No. 18 at 4].

While there is no doubt that parents and students were concerned about the scheduling changes, Creasy admits that Shulsky told the guidance counselors "that they were responsible for all parent complaints and would face a reprimand if they failed to address [them]." [Id.]. In her Amended Complaint, Creasy asserts that many parents consulted her. "[W]hen the basic structure of the schedule denied some opportunity to their children which they desperately wanted and her hands were tied because she could not *change* the master schedule and lacked the authority to undo the harm, Creasy would advise, on occasion, that there were other channels, i.e., political channels, involved with working up the chain of authority that could be followed. [ECF No. 16 at ¶ 45] (emphasis in original). She contends that this advice was speech as a citizen and not speech that was within her duties as a guidance counselor. In fact, in her Amended Complaint, Creasy acknowledges that she was given responsibility for handling parent complaints. When she perceived that there was nothing further that she could do as a guidance counselor, she notified these parents that they would have to escalate their protests to a "higher authority." [Id. at ¶ 46]. She alleges that this "speech was outside the scope of her duties." [Id.]

The law fails to support Plaintiff's position. "The objective inquiry into whether a public employee spoke 'pursuant to' his or her official duties is 'a practical one.'" Weintraub v. Bd. of Educ. of City Sch. Dist. of New York, 593 F.3d 196, 202 (2d Cir. 2010) (quoting Garcetti, 547 U.S. at 424). "In order to determine if a public employer's termination of an employee violates the constitutional guarantee of free speech, a court must 'balance between the interests of the

9

[employee] as a citizen, in commenting upon matters of public concern and the interest of the [public employer], in promoting the efficiency of the public services it performs through its employee.'" Miller v. Clinton Cty, 544 F.3d at 548 (quoting Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty, Il., 391 U.S. 563, 568 (1968)0.

The United States Court of Appeals for the Second Circuit in Weintraub, discussing the impact of Garcetti on the Pickering analysis, observed that "[t]he Garcetti Court cautioned courts against construing a government employee's official duties too narrowly." Weintraub, 593 F.3d at 202 (explaining that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes") (quoting Garcetti, 547 at 524-25)). In determining whether a plaintiff spoke as a citizen or an employee, courts must consider whether the speech advanced the plaintiff's "core [employment] duties" and whether the form of the speech had "a relevant citizen analogue." Id. at 203. "[A] public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command." Winder v. Erste, 556 F.3d 209, 215 (D.C.Cir. 2009).

The decision in Medina v. Dept. of Educ. of the City of New York, No. 10 Civ. 1180, 2011 WL 280800 (S.D.N.Y.) is instructive. Medina alleged that he received an unsatisfactory review and was wrongfully terminated from his position as a high school guidance counselor after he complained about the school's policy on suspension and insufficient supervision of students. The record shows that he raised these issues with the school principal, the union chapter leader, a union delegate "and . . . unnamed parents of the students attending [the high

10

school]." Id. at *1. The essence of the complaints was that students were being suspended without proper evidence, and that this could have "a lasting impact on the student's future." Id. As here, Medina alleged that his "advocacy was separate and apart from any of his job responsibilities . . . as a guidance counselor [and his statements were made] as [a] citizen expressing grave concern regarding matters that are a matter of public concern . . . . [His] job responsibilities did not include monitoring the safety of students, and did not include reporting . . . these safety issues to the union and to the parents of students." Id. (internal citation omitted).

Evaluating Medina's allegations, the District Court wrote:

> [T]he Court is permitted to resolve a motion to dismiss [on] a First Amendment retaliation claim as a matter of law under the Twombly/Iqbal plausibility analysis by making an objective, practical and common sense appraisal of a public employee's official duties, and not relying solely on the factual or conclusory allegations contained in Plaintiff's pleadings about what their job description included or does not provide for as part of their official duties.

Id. at *3 (quoting Adams v. New York State Educ. Dept., 752 F. Supp. 2d 420, 428 (S.D.N.Y. 2010).

The Court is convinced that the Medina analysis applies with equal force here: "Plaintiff's conclusory statements that advocating for the students at the high school [is] separate and apart from his job responsibilities as a guidance counselor and that his responsibilities do not include reporting concerns about the health and safety of his students are not 'entitled to the assumption of truth.'" Id. (quoting Iqbal, 556 U.S. at 679). "The Court cannot assume that [Plaintiff] was speaking as a private citizen when he advocated for and complained on behalf of the students of the school based solely on his allegation that the subject matter of his concerns [could not be addressed by one with] his job description." Id. The Court agrees with the result in Medina, and adopts the following excerpt as its holding here:

11

> The Court finds the plausibility of [Plaintiff's] claim that [s]he spoke as a private citizen is . . . undermined by the fact that [s]he complained only to the school principal, [her] union representatives and parents of the students. Plaintiff was only in a position to raise these concerns to these specific people as a direct result of [her] position as a guidance counselor. Plaintiff does not allege that [s]he spoke with anyone external to the school system about [her] concerns. Therefore, [the speech at issue] constitute[d] "internal communication." This is an avenue of communication that is not available to private citizens. Plaintiff's claim [s]he spoke as a private citizen is implausible under these circumstances.
>
> Accordingly, the Court finds that an objective, practical, and common sense review of the allegations makes it impossible to find that the Plaintiff has alleged a plausible claim that [her] comments were made by a private citizen and were therefore protected by the First Amendment.

Id. at **3-4. (citation omitted).

Creasy's Right to Petition

Creasy next contends that when she met with District officials, contacted union officials, and spoke with parents about their rights, she was exercising rights afforded and protected by the First Amendment's Petitions Clause, which protects the right of persons "to petition the Government for a redress of grievances." U.S. CONST. AMEND. I. "The Petitions Clause of the First Amendment, unlike the free speech clause, refers to specific conduct [whereby] an individual addresses the government and asks the government 'to fix what, allegedly, government has broken or has failed in its duty to repair.'" Gardner v. Barry, 1:10-CV-0527, 2010 WL 4853885 at *10 (M.D. Pa. Nov. 23, 2010) (quoting San Filippo v. Bongiovanni, 30 F.3d 424, 442 (3d Cir. 1994)) (additional citations omitted). "Such conduct literally involves petitioning the government, either through formal mechanisms, such as lawsuits, grievances and workers compensation claims, or informal mechanisms, such as letters to the government." Id.

As with the Free Speech Clause, "constitutional protection does not extend to grievances

relating only to matters such as 'working conditions, pay, discipline, promotions, leave, vacations, and terminations.'" Mitchell v. Miller, ___ F.Supp.2d___, Civil Action No. 10-1291, 2012 WL 3204476 at * 12 (W.D. Pa. Aug. 3, 2012 (quoting Guarnieri, 131 S.Ct. at 2496)). "In the aftermath of Guarneri, public employees enjoy constitutional protection from retaliatory discipline for their petitioning activities only when such activities "seek to advance political, social, or other ideas of interest to the community as a whole." Id. (internal citation omitted) "The Petition Clause [guarantees] a right to participate as a citizen, through petitioning activity, in the democratic process. It is not a right to transform everyday employment disputes into matters for constitutional litigation in the federal courts." Id. at *12 (citing Guarnieri, 131 S.Ct. at 2501). The same reasoning that applied to Creasy's Free Speech Clause Claim dooms her claims under the Petitions Clause. Although, "in one sense, the public may always be interested in how government officers are performing their duties, . . . as the Connick and Pickering test has evolved, that will not always suffice to show a matter of public concern." Id.

The Association Claim

In order to state a viable association claim under the First Amendment, a plaintiff must show that: "(1) she was employed at a public agency in a position that does not require political affiliation, (2) she was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision." Galli v. N.J. Meadowlands Comm'n, 490 F.3d 265, 271 (3d Cir. 2007) (citing Stephens v. Kerrigan, 122 F.3d 171, 176 (3d Cir. 1997)).

The first element of Creasy's association claim is clearly satisfied. For purposes of this Opinion, the Court will assume, too, that the second requirement has been met by Shulsky's alleged effort to curtail Plaintiff's communication with members of her union. See [ECF No. 49].

Causation, the third element, is, however, problematic. The picture painted by the record is one of an admittedly vocal employee put in a difficult place by Shulsky who, perhaps responding her own set of pressures, used Creasy as a scapegoat. The schedule changes initiated by Shulsky generated significant negative reactions from vocal parents, students, teachers, and members of the administration. Creasy - who seems to have been genuinely concerned about its effects - spoke out against the schedule revision and apparently against Shulsky for her determination to implement change in the face of considerable resistance. Shulsky reacted by making life as difficult as possible for Creasy. Only a relatively small part of Shulsky's conduct, though, related to Creasy's relationship with her union representative.

Shulsky's problems with Creasy began before Creasy contacted the union. Prior to the union's involvement, the guidance counselors received a "harsh letter" from Shulsky, "informing them that they were responsible for all complaints" and would be reprimanded if they failed to address them. [Id. at 30.] Because Creasy did not believe she had authority to resolve these complaints without Shulsky's input, she contacted her union representative. The record does not show that Shulsky reacted to this. She and Creasy worked together over the Labor Day weekend to settle scheduling questions, but were unable to do so. It was then that "Shulsky became increasingly frustrated and hostile towards [sic] Mrs. Creasy," demanding that she return the key to the school, making impossible work demands, sending the school secretary to read memos to Creasy in a derisive manner, telling others that Creasy was responsible for clerical errors that were the genesis of the scheduling debacle, excluding Creasy from data input, and insisting that all communication between the two women be in writing. [Id. at ¶¶ 35-42].

When Shulsky learned that Creasy had advised parents to carry their complaints up the chain of command, she emailed Plaintiff, "accusing her of multiple mistakes and advising her

14

that 'a teacher shared that you told [them] that I screwed up the schedule . . .'" [Id. at ¶ 47]. That email ended as follows: "Trust and loyalty are huge with me. You have broken that trust because every time I turn around I have a parent or teacher telling me that you said something or comments are made that are untrue." [Id.]. Creasy forwarded this email to her union representative. Shulsky then revealed that she was monitoring Plaintiff's email, "implicitly warning her against involving her Union." [Id. at ¶49]. The union president and the school superintendent scheduled a meeting to "alleviate the situation." [Id. at ¶49]. Before that meeting could take place, however, Shulsky directed Creasy to appear in her office *and to bring a union representative*. The assistant principal also attended. Shulsky lectured Plaintiff, physically intimidated her, and presented her with a Letter of Reprimand detailing a host of deficiencies in Creasy's performance. [Id. at ¶54]. In response to the severity of the situation, the union filed a grievance. At a subsequent meeting attended by Creasy, Shulsky, the assistant principal, and the school superintendent, the superintendent directed that the Letter of Remand be modified, but it "remained punitive in nature." [Id. at ¶63]. Creasy, who believed that she would be returning to a work environment that was inconsistent with her mental health, alleges that she was forced to resign.

This reiteration of the facts is important because it illustrates the weakness of the causation element of Plaintiff's First Amendment association claim. Although Creasy sought and secured her union's help, thus displeasing Shulsky, it is clear that the involvement of the union was not a significant part of the fractious relationship between Shulsky and Creasy, or with Creasy's resignation. The facts alleged in the Amended Complaint fall short of raising a plausible inference that Creasy's association with her union was was a substantial or motivating

15

factor in Shulsky's action. Creasy has failed, therefore, to state an association claim under the First Amendment.

IV. CONCLUSION

For the reasons set out above, Count III of Plaintiff's Amended Complaint will be dismissed as to both Defendants with prejudice. An appropriate Order follows.

ORDER

AND NOW, this 12th day of February, 2013, it is hereby ORDERED that Defendants' Motion to Dismiss Count III of Plaintiff's Amended Complaint [ECF No. 17], alleging violations of the First Amendment of the United States Constitution, is GRANTED.

*Cynthia Reed Eddy*
Cynthia Reed Eddy
United States Magistrate Judge

cc: All Counsel of Record via CM-ECF