IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BETTY CREASY, ) | |
| ) | Civil Action No. 12-00953 |
| Plaintiff, ) | Magistrate Judge Cynthia Reed Eddy |
| ) | |
| v. ) | |
| ) | |
| SLIPPERY ROCK AREA SCHOOL ) | |
| DISTRICT; KRISTIE SHULSKY, ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM OPINION

In this matter brought by Betty Creasy ("Creasy" or "Plaintiff"), a former Slippery Rock High School ("the High School") guidance counselor, the Court considers the pending Motion for Summary Judgment [ECF No. 26] filed by Defendants, Slippery Rock Area School District ("the District") and Kristie Shulsky ("Shulsky").[1] In an Amended Complaint [ECF No. 16], Creasy alleges a hostile working environment and constructive discharge as a result of age discrimination in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, et seq. ("ADEA") (Count I);[2] and the Pennsylvania Human Relations Act, 43 Pa. Con. Stat. Ann. §§ 955, et seq. ("PHRA") (Count II). In the Amended Complaint, she also alleged, pursuant to 42 U.S.C. §1983, retaliation in violation of her rights under First Amendment to the United States Constitution (Count III). In a separate Opinion [ECF No. 23], the Court granted Defendants' Motion to Dismiss the First Amendment Claims [ECF No. 17]. Now, having

---

[1] The parties have consented to jurisdiction by the United States Magistrate Judge. See [ECF Nos. 6 and 7]. See also 28 U.S.C. § 636(c)(1).

[2] Under the ADEA, it is unlawful for an employer to "discharge any individual . . . because of such individual's age." 29 U.S.C. §623(a)(1).

carefully reviewed the entire record pertaining to alleged age discrimination, the Court will grant Defendants' Motion for Summary Judgment on the ADEA and PHRA claims.[3]

**BACKGROUND**

Plaintiff was employed by the District for a total of eleven years. Beginning in the academic year 2007-2008, Creasy worked as a guidance counselor at the District's high school, where Harry Biel ("Biel") was principal. [ECF No. 16 at ¶¶5, 8]. When Biel retired at the end of the 2008-2009 school year, Shulsky, the former assistant principal who had responsibility for supervising Creasy and a second guidance counselor, Andy Johnson ("Johnson"), assumed the position of principal. [Id. at ¶9]. Plaintiff contends that when Shulsky became principal, she created an environment hostile to senior faculty. [Id. at ¶10]. Despite this allegation, Plaintiff, who was over fifty at the time, had maintained a good working relationship with Shulsky prior to and during that year and does not contend that there had been animosity between them. [ECF No. 28-1 at p. 42]. Creasy had never been reprimanded, and had never filed a grievance of any type. She was not aware that any other staff member had pursued a grievance alleging discrimination by Shulsky. [Id. at pp.43-44].

At the end of Shulsky's first academic year as principal, Johnson retired and was replaced by Janet Cushman, who was over forty. [ECF No. 16 at 11]. Creasy admits that although she assumed that one of the other applicants with seventeen years of experience would have "[been] older," she did not know the ages of other applicants for the open position, or whether Shulsky was part of the committee that made the hiring decision. [ECF No. 28-1 at pp. 154-56].

---

[3]The Court's discussion of Plaintiff's ADEA claim applies with equal force to her PHRA claim, as the same legal standard governs both. Kautz v. Met-Pro Corp., 412 F.3d 463, 466 n.1 (3d Cir. 2005) (citing Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506 n.2 (3d Cir. 2004)).

In March 2010, the time of the year when staff typically let the school administration know whether they planned to retire, Creasy was near the school office where the seniority list for all teachers was posted. "It was around the time everybody talked about who was leaving and who might still consider it." [ECF No. 28-1 at p.139]. Creasy was there because she was curious about where she ranked – "who had years who might be considering it. We all looked at different benchmarks for our own careers." [Id.]. The seniority list showed the identity of the teachers and their hire date. Nothing indicating the teachers' birthdates appeared on the list. [Id.]. That year, the District offered "an early retirement incentive" which seven teachers decided to accept. [ECF No. 28-1 at p.134]. It was these retirements and Shulsky's alleged reaction to them that first raised the specter of age discrimination with Creasy.

Creasy reports that as she was perusing the list, she was speaking with Shulsky, who said "almost verbatim," "I'm happy to see these older employees retire." [Id. at p.140]. Shulsky elaborated that she "hoped she could get rid of a few more," because she could take younger teachers and "train them right up." [Id.]. When Shulsky particularly mentioned that she would like to see faculty members Clyde Conti and George Petrak leave, Creasy brought up her own age, telling Shulsky that she was "over 50." [Id.]. Creasy believed that she fell into the same category as these other teachers. [Id. at p. 141]. She did not know that Michael Kish and George Petack were six years her junior, or that that Eva Brenneman, Martha Campbell, and Nancy Kneupper, the other retiring teachers were five years younger than she. She did not know Clyde Conti's age. [Id. at p.141]. Responding to Creasy's comment about her own age, Shulsky said, "[T]hat won't apply to you. I need you for scheduling." [Id.].

Creasy believed that Shulsky's comments were discriminatory. She did not, however, tell Shulsky that she was offended, and, in fact, admits she was flattered by Shulsky's impression

that Creasy was younger than the retiring teachers. [Id.]. Although she had a copy of school policies regarding discrimination and the complaint process, Creasy did not convey Shulsky's comments to anyone, including the District Superintendent, and was unaware of any written record that she had raised the issue with her union representatives. When asked whether she agreed "that the first time that there's anything in writing about [her] complaint of [the] conversation [was] the Pennsylvania Human Relations Complaint," Creasy answered, "Yes." [Id.].

Creasy did not know what motivated any of the retiring teachers to leave, knew nothing about the replacement applicant pool, and could not speak to Shulsky's role in the hiring process. She only "knew who was hired after the fact." [Id.]. She was unaware that there were three eligible teachers who declined the incentive retirement option, and had never heard any of them complain about how they had been treated by Shulsky. [Id. at p.138]. Moreover, she testified at her deposition that she did not have reason to believe that any of the incentive retirees left because of age or other discrimination, but knew that at least one younger teacher felt that Shulsky had not treated her well. [Id. at pp. 150-52].

In the summer of 2010, Creasy was responsible, for the fourth time, for entering data into a computer program to generate the high school's master schedule. Cushman, the newly hired guidance counselor, had no previous scheduling experience. Prior to the start of the 2010-2011 academic year, Shulsky undertook modification of the schedule that had been in place during Beil's tenure. "[She] changed the bell schedule and also shortened the periods in which courses were traditionally offered under [the prior] schedule." [ECF No. 33-1 at ¶10]. "Scheduling problems arose from the times/periods in which Shulsky scheduled certain courses." [Id. at ¶15]. Creasy worked very hard to understand and implement the new complicated schedule. [Id. at 16-

19]. "Despite the drastic changes and abstract manner in which Shulsky conceived the schedule, [Shulsky] immediately implemented the new scheduling framework without fully testing its viability. There was no transitional period or trial period for the new schedule." [Id. at ¶21]. Creasy "was the biggest stakeholder in entering the [relevant data] thoroughly and accurately." [Id. at ¶35]. Shulsky told the guidance secretary and the other guidance counselor to permit Creasy to enter relevant data. [Id.].

According to Creasy, Shulsky did not share the master schedule with teachers or parents until two weeks prior to the start of school. Thus, the magnitude of the schedule revision was not known until then. [ECF No. 28-6 at ¶24]. Scheduling conflicts angered parents and teachers, and many called the high school to complain. [Id. at ¶25]. They also called District Superintendent Kathleen Nogay ("Nogay") with their concerns.

The full scale of problems with the new schedule became apparent after the start of the 2010 academic year. Superintendent Nogay acknowledged that these problems were largely traceable to inputting errors made by Creasy. [ECF No. 33-1 at ¶3]. Creasy herself admitted this, testifying at her deposition that problems were caused because no period six had been included in the schedule. She acknowledged that she had "neglected" to take something out of the old system and incorporate it into the new. [ECF 28-1 at pp. 230-31]. She assumed that if she had run a conflict check, this would not have happened. [Id. at p. 232]. In the same deposition the following exchange occurred:

> Q. In the course of the work that you did on the 2010/2011 schedule, at what period of time did you realize that there were inputting errors caused by your confusion on the split period?
>
> A. Kristie brought it to me pretty soon into the year. When kids weren't – again, with kids in the hallway and teachers saying I can't get from teaching this class and get to teaching – or doing lunch duty, the kids get left in that overlap time, especially, the

gym teachers because they – the kids were in the locker rooms unsupervised.

[Id. at pp. 60-61].

At another point in her deposition, Creasy spoke about her errors entering the split period schedule, and recognized that these "inputting errors ended up with some students who didn't have anywhere to go in between lunch and some of the split periods." [Id. at p. 55]. "[K]ids were running around at lunch with nowhere to go." [Id.]. Changes that had to be made in the computer program were "taking up a substantial amount of time in the guidance office . . . to the point where it was difficult for [Creasy] to complete [her] work." [Id. at p. 58]. Creasy was the only one involved in fixing the inputting errors." [Id. at p. 59]. Parents and teachers were upset. [Id.]. Inputting errors was not the only problem; some classes had been overscheduled. The guidance office was inundated with telephone calls and visitors.

During the time that the schedule was in turmoil, Shulsky's attitude towards Creasy changed. On August 26, 2010, Shulsky sent the following Interoffice Memorandum to Creasy and Cushman:

> Please be advised that making adjustments to current schedules is the responsibility of the counselors. I am available to help consult if necessary, but this is your job. Unfortunately, we cannot anticipate schedule conflicts and we have to work with angry and upset parents and students when we cannot accommodate all of their wishes. With only eight periods in a day, the reality is that we will deal with issues each year because we cannot make everyone happy.
>
> Normally these are changes that violate policy by skipping something or taking a class out of order or in a differrent academic year than is required. Or they have requested to be placed in an Academic or AP class when the student does not meet the requirement or prerequisite.
>
> I am directing you to answer their questions and be prepared to make the tough decisions. I do not appreciate, nor is it acceptable,

6

> for you to lead parents to believe that you don't have the "authority" to make changes, but I do. There have been several parents come to my office and have shared that you cannot do something, but have been told by a counselor that I can make that change.
>
> If this continues, I will have no choice but to consider you insubordinate. We MUST work together to make this school successful. I will not accept this type of miscommunication between offices. It makes all of us look bad and as if we don't know what is going on. You are putting me in a position that I do not appreciate.

[ECF No. 33 Ex.19.42].

After receiving this letter, Creasy contacted her union representative, Joan Timko ("Timko") to express concern about the schedule and her worry that Shulsky's "effort to shift responsibility for the problems could negatively impact [Creasy's] relationship with the parents and . . . the school faculty and staff." [ECF No. 16 at ¶32]. On August 29, 2010, Creasy began forwarding Shulsky's emails to her union representatives.

On September 2, Shulsky emailed teachers regarding changes in their schedules, stating, "Unfortunately Mrs. Creasy input a few things incorrectly in the computer. I am doing my best to correct this." [ECF No. 33 Ex. 19.14, 19.15]. On September 5, Shulsky wrote to Nogay that "[she was] pretty sure [she could] fix [the schedule]. She stated:

> I am very frustrated because [Creasy] sits there crying, apologizing for her mistakes, yet she doesn't know where to begin and I have to literally walk her through each schedule change. She could not visualize what I was telling her. I had to write it out, draw arrows, write semesters and quarters by things because the rotations are challenging for her – without the split periods!!!! These are huge errors that have consumed all my time so far this year.
>
> I was losing my patience, so I told her we could work more tomorrow
> . . . .

7

> I guess I'm most upset because she entered the data, and if it were me, I'd work every waking minute until I had it right. She isn't doing that. She only wants to work on it when I'm sitting right beside her. She truly doesn't understand it.

[Id. Ex.19.18]. Nogay replied to Shulsky's email, asking whether the entire schedule needed to be scrapped. "The ramifications of her incorrectly entering periods 5-9 seem monumental. [Id.]

On September 7 and 9, one of the vocational teachers wrote to Shulsky complaining that he had too many students in his period 8/9 technology class. [Id. Ex.19.21]. Shulsky replied that she understood that [Creasy] had been working on the problem but the teacher replied that the problem was ongoing. [Id]. The same day, Shulsky notified Creasy that she should be returning all telephone calls directed to her, and that she should not expect the other guidance counselor to return her calls or to make appointments on her behalf. [Id. Ex.19.22]. Scheduling issues persisted, though Creasy had been directed to make "[f]ixing schedules a priority. It needs to get done immediately. I will not accept this and will proceed with a letter of discipline if this continues." [Id. Ex. 19.24]. The evening of September 7, 2010, Shulsky wrote to Creasy and Cushman about the timely completion of assigned tasks. She then wrote that she had heard from a teacher that Creasy had accused Shulsky of "screw[ing] up the schedule." [Id. Ex. 19.49]. Shulsky wrote:

> Unfortunately, this is not the first person I heard this from . . .
>
> I have done nothing but support you and Janice, sat while you cried and apologized for your errors, and told you we would work through it together. I spent the first three days of school, all day Sunday and part of Monday and most of the afternoon today helping. Not one time have I told anyone, but the superintendent the real issues. Those issues are quite simply that that you entered several things wrong. We've had overlapping classes in several places, teachers' lunches scheduled to a split period and not a lunch period, and just one mess after another. . . .

> These were simple mistakes that should have never happened, but I have supported you in fixing them and have dedicated all my time in doing so. However, I will not tolerate you telling anyone that I messed it up when we both know that's not the case.
>
> Trust and loyalty are huge with me. You have broken the trust because every time I turn around I have a parent or teacher telling me you said something or comments are made that are untrue. I look to you as an extension of what I do each day and right now I do not believe you are on my team. If fact, when you make a mistake, you pass the blame to someone else. I am frustrated, tired and disappointed by this.
>
> I would also like you to stop telling people, insinuating to people, or making any type of reference that I messed up the schedule. It is unprofessional, inappropriate and untrue. And I will not tolerate it. I would like to work together, but I don't know how that is possible without trust and support. It's time to just make things right. I would like to remedy this now so it doesn't become a more serious issue.

[Id. Ex.19.51]. Creasy was upset over this email, but did not believe that it reflected any age-related bias, aside from the fact that it was sent to her. [ECF No. 28-1 at p.250]. Cushman, too, was upset by this email, and went to discuss its contents with Shulsky. Creasy did not respond. [Id. at pp. 251-52].

On September 8, 2010, Shulsky wrote to the faculty asking that they notify her of scheduling errors:

> From there, I will more than likely have Mrs. Cushman make those adjustments. Please do not forward them to the guidance office directly, as I will assign changes to ensure that we do not encounter any additional inputting errors.
>
> Again, I apologize for all the changes. I think I have caught all the errors that were put in to the teacher table in Star Base last spring. Unfortunately, those errors were not generated from the main office, so I did not catch them until the students actually arrived and followed their schedules.

9

[ECF No. 33 Ex.19.32]. Five days later, Shulsky again wrote Creasy, noting that parents who had tried to reach Creasy had been unable to do so. On September 14, Shulsky reminded Creasy, via email, that all communication received in written form should not be shared outside the circle of teachers, staff, or high school administrators. "Please keep this in mind, as forwarded emails and memos are easily tracked." [Id. Ex.19.34].

Shulsky did not like the way that Creasy had handled scheduling issues for four students, and on September 7, 2010, she wrote Creasy an email telling her to fix them. She expected Creasy to perform other duties at the same time she was forced to make scheduling adjustments. In addition, she asked that Creasy return a building key that Biel had given her, sent teachers to Creasy for schedule adjustments without approving them first, withheld help, sent all guidance calls to Creasy, expecting her to return them before the end of the day, reprimanded Creasy for not being able to correct a student's schedule that Shulsky herself had been unable to fix, sent personal attacks to Creasy in text messages and emails, and sent an email to all faculty, blaming Creasy for failures in the new schedule and questioning her competence. [ECF 33-1 Ex.1 at ¶¶24-28]. Creasy also alleges that Shulsky directed that Creasy and Cushman make the tough decisions, but then overruled most of Creasy's. [Id. at ¶28]. Creasy was asked to communicate with Shulsky only through email. [Id. at ¶29]. Shulsky sent an email to both counselors raising the issue of insubordination, but apologized only to Cushman. [Id. at ¶30]. Creasy was presented with intractable tasks that Shulsky could not resolve, and Shulsky publically placed the blame for inability to solve the problem on Creasy. At the same time, Shulsky believed that Creasy was doing the same to her. [Id. at ¶33].

Shulsky sent emails to Creasy nearly every day directing her to perform various tasks by the end of the workday, some of which Creasy did not know how to do. See e.g., [ECF No. 28

Ex.19.52]. After one exchange addressing the needs of a particular student, Shulsky wrote that she would prefer that Creasy answer by email the question she had posed. [Id. Ex.19.37]. This is the basis of Creasy's allegation that Shulsky "adopted a policy that all communications between [Shulsky and Creasy] be via email." On two occasions when Creasy had not yet read her email, Shulsky's secretary came to the guidance office with a hard copy, which she read to and left with Creasy. [ECF No. 28-1 Ex. A at p.60].

Shulsky summoned Creasy to a meeting in her office on September 16, 2011, and asked that she bring a union representative. The assistant principal also attended. At that meeting, Shulsky became agitated and somewhat aggressive as she read a letter of reprimand to Creasy. [Id. at p. 280]. The reprimand was based on Shulsky's allegation that one student did not have a schedule two weeks into the school year, and that Plaintiff failed to follow Shulsky's directive that this student's schedule be finalized. [ECF No. 33 at ¶75]. Creasy understood that if she were to receive a second reprimand, she would be discharged from her job. [ECF No 28-1 at p. 280]. Following that meeting, Creasy left her position, taking sick leave. [ECF No. 33 at ¶2]. Her excuses from work did not contain a diagnosis, but one letter from her primary care physician stated that Creasy was experiencing significant job-related stress. [Id. at ¶4].

On October 18, 2010, while Plaintiff was on sick leave, a meeting took place. It was attended by Plaintiff, Nogay, Assistant Principal Dan Szolek, Shulsky, and union representatives, Nancy Moser and Steve Wilson. At Nogay's suggestion, the reprimand was modified to "a letter of concern" [Id. at ¶33]. Creasy's suggestion that she or Shulsky be transferred to another building was rejected, but sensitivity training for Shulsky was discussed. [Id. at ¶¶81-82]. Nogay wanted Creasy to return to work.

11

Creasy resigned her position effective January 11, 2011, the date on which her available sick leave was exhausted. [Id. at ¶5]. On February 7, 2011, Creasy filed a Complaint with the Pennsylvania Human Relations Commission, alleging that she had been subjected to an age-related hostile work environment resulting in adverse employment action such as "unfounded reprimands and discipline," [Id. ¶6], and suffered a constructive discharge as a result of age discrimination. [Id. at ¶¶5-6]. The PHRA claim was dismissed. The EEOC issued a right to sue letter on May 16, 2012 [ECF No. 28-7], and this action was initiated on July 10, 2012 [ECF No.1].

**STANDARD OF REVIEW**

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).[4] Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A motion for summary judgment will only be denied when there is a genuine dispute of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, (1986). As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248.

---

[4]Rule 56 was amended effective December 1, 2010. The explanatory notes to the 2010 amendments explain that while the language in Rule 56 was changed from "issue" to "dispute," the "standard for granting summary judgment has not changed."

In determining whether the dispute is genuine, the Court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. Rather, the Court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. McGreevy, 413 F.3d at 363; see also Simpson v. Kay Jewelers, 142 F.3d 639, 643 n.3 (3d Cir. 1998) (quoting Fuentes v. Perskie, 32 F.3d 759, 762 n.1 (3d Cir. 1994)). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. Watson v. Abington Twp., 478 F.3d 144, 147 (3d Cir. 2007).

**DISCUSSION**

Hostile Work Environment

"Plaintiff's age discrimination claim is that she was subjected her to a hostile work environment, which eventually led to [her] constructive discharge." [ECF No. 31 at p.2]. The Court turns first to the allegations purporting to establish that Creasy was exposed to a hostile work environment.

Hostile working environment and constructive discharge claims are typically intertwined. In assessing whether an employee is entitled to recover on a constructive discharge claim, the United States Court of Appeals for the Third Circuit uses an objective test. Duffy v. Paper Magic Grp., Inc., 265 F.3d 163, 167 (3d Cir. 2001). "Specifically, a court must determine 'whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign.'" Id. This means that in order "[t]o prove constructive discharge, a plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Spencer v.

Wal-Mart Stores, Inc., 469 F.3d 311, 316 n.4 (3d Cir. 2006), quoting Landgraf v. USI Film Prods., 968 F.2d 427,430 (5th Cir. 1992), aff'd, 511 U.S. 244 (1994)).

In order to establish a prima facie claim based on a hostile work environment, an employee must demonstrate that: 1) she suffered intentional discrimination due to her membership in a protected class; 2) the discrimination was pervasive and regular; 3) she was detrimentally affected by the discrimination; 3) the discrimination would have detrimentally affected a reasonable person of the same class; and 5) the existence of liability under the doctrine of respondeat superior. Abramson v. William Patterson Coll. of N.J., 260 F.3d 265, 276-77 (3d Cir. 2001). Criteria to be considered in determining the existence of a hostile work environment include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonable interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993).

Factors figuring in the analysis of constructive discharge claims are somewhat more strict, including "being threatened with discharge; being urged to resign or retire; being demoted or receiving a reduction of pay or benefits; being transferred to a less desirable position; and an alteration of job responsibilities; and receiving unsatisfactory job evaluations." Epstein v. Pittsburgh Sch. Dist., Civ. Act. No. 10-1593, 2011 WL 4368371 at * 4 (W.D. Pa. Sept. 19, 2011) (citing Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)).

The Court need not reach Creasy's claim based on constructive discharge, because, following a thorough sifting of the record, the Court finds that Creasy has failed to state a hostile work environment claim. Because the standard for constructive discharge is even more demanding, if she has not adduced evidence sufficient to show the existence of a hostile work environment, her constructive discharge claim fails by default. See Spencer, 469 F.3d at 316 n.4.

The record evidence relating to age is markedly spare. Creasy's primary evidence concerning Shulsky's allegedly ageist views stems from the principal's comment, made during the spring of 2010, that she wished that more older teachers, two in particular, would retire. When Creasy revealed that she was over fifty, Shulsky replied, "Oh well. That won't apply to you. I need you for scheduling. [ECF No 28-1 at p.166]. Creasy was not offended by this conversation. "I think I was more appreciative that I was safe for awhile. I felt like, okay, then. It's a matter of time, perhaps, but I'm still okay here." [Id.].

The linchpin of Creasy's ADEA claim is her contention that Shulsky's statement about wishing that she could get rid of more teachers, specifically Clyde Conti and George Petak, through the retirement incentive plan was direct evidence of discriminatory animus. Creasy did not testify that Shulsky told her why she wanted these particular employees to retire, except that Shulsky did say that she could "take young employees and train them up right." [Id. at p.164]. The Court does not find that the case law supports Creasy's characterization of Shulsky's statements as direct evidence. "If the trier of fact must infer discrimination from the employer's remarks or actions, then the evidence is not direct evidence of discrimination." Weightman v. Bank of New York Mellon Corp., 772 F. Supp.2d 693, 702 (W.D. Pa. 2011) (citing Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994)). "Only the most blatant remarks, whose intent could be nothing other than to discriminate in reaching an employment decision, are considered sufficient to constitute direct evidence of discrimination. Id. (internal citations omitted). "Derogatory comments or stray remarks in the workplace that are unrelated to employment decisions, even when uttered by decision-makers, do not constitute direct evidence of discrimination." Id. (citations omitted).

Shulsky's comment about the 2011 list of voluntary retirees was a single remark unrelated to any employment decision or action taken by Creasy. There is no evidence in the record to support, and Creasy does not allege, that any retiree was forced out because of age, or viewed himself as a victim of age discrimination. That Creasy admits to having been flattered by Shulsky's remarks, was reassured that her job was not in jeopardy, did not repeat the remarks to others, and did not contact her union representative undercuts her argument about the clarity and the severity of Shulsky's remarks.

Creasy next argues that if the "direct evidence" cited does not establish that she was a victim of age discrimination, the circumstantial evidence of record does. She argues first that ageism may be inferred from the "flight of older employees from the high school" in the year that Shulsky became principal. [ECF No. 31 at 10]. She does not point to any evidence, however, showing that any of these retirees left due to adverse treatment based on age, and admits that she does not know why they left. [ECF No. 28-1 at pp. 311-315].

Creasy also contends that the history of discipline meted out to older employees was unduly harsh when compared to the action taken when younger employees committed infractions of school rules or policy. She states:

> Shulsky was heavy handed in disciplining older employees and manipulated circumstances to create an undesirable working environment. For example, older teachers were frequently issued a formal "Letter of Reprimand" that was placed in their personnel files for isolated incidents of minor conduct. Younger teachers, however, were given less formal warnings via email or interoffice memo that were placed in a 'site file.' This inconsistency in discipline is highlighted by Shulsky's actions regarding Clyde Conti, Angela Mastrean and Angela [sic] Benjamin. While all three teachers failed to provide appropriate coverage during their scheduled lunch periods, the younger teachers were given warnings and the older teacher was disciplined and received an unpaid suspension.

[ECF No. 31 at 10].

Creasy's synopsis fails to reflect that there were significant differences in the severity of the infractions committed by these employees. For example, Ashley Benjamin, born in 1984, reported late for lunch duty one day, and, on another occasion, wore shorts to school. [ECF No. 33-2 Exs.12.1, 12.13]. Angela Mastrean, born in 1986, failed to cover a day of lunch duty. Clyde Conti born in 1951, was not in the cafeteria to supervise students when there was a fire drill. [Id. Ex.12.2]. There is, however, no evidence in the record materials that this difference in treatment was age-based. Andy Johnson, born in 1949, received two letters of reprimand for making disrespectful comments to Shulsky in a setting where others could observe their interaction. (Id. Exs.12.4, 12.5). Jeff Griggs, born in 1953, was issued a reprimand for sharing the contents of an email he received from Shulsky, and telling students that what Shulsky was doing was illegal. [Id. Ex. 12.6]. Katie Dickey, born in 1981, was admonished in an email for being four minutes late to school, [id. Ex.12.10], and received a Letter of Reprimand for loaning a student a key to school facilities. (Id. Ex.12.11). Finally, Creasy alleges that Karyn Beck, born in 1975, supplied alcohol to students on a field trip, but was not reprimanded. In fact, however, Beck was summoned to a Loudermill hearing, and ultimately resigned. [ECF No. 37-5]. The Court finds no discernible pattern of age discrimination in these disciplinary proceedings.

Creasy has failed to point to evidence in the record that would permit a reasonable jury to conclude that she was the victim of intentional age discrimination. Thus, she has not satisfied the threshold requirement of a hostile work environment claim. The Court finds nothing in this record to suggest that Creasy was subjected to a hostile work environment because of her age.

## CONCLUSION

Because Creasy has failed to show that she suffered intentional discrimination due to her membership in a protected class, Defendants are entitled to Summary Judgment. Appropriate Orders follow.

June 7, 2013

By the Court,

_____
Cynthia Reed Eddy
United States Magistrate Judge

cc:   Counsel of record via CM-ECF